**In the Matter of the ESTATE of Fred DUHME, Deceased.**

**Kenneth A. DUHME, As Executor of the Estate of Fred Duhme, Deceased, Melvin A. Duhme, Thelma A. Blatt, Arlene A. Tegmeier, and Helen A. Spratt, Appellees,**

v.

**Raymond A. DUHME, Appellant.**

**No. 2–60624.**

Supreme Court of Iowa.

June 28, 1978.

See also, Iowa, 260 N.W.2d 415.

Goodenow & Wright, by Kenneth E. Wright, Maquoketa, for appellant.

Dennis E. Roberson, Maquoketa, for appellee Kenneth A. Duhme.

Remley & Heiserman, by J. E. Heiserman and Jay A. Willems, Anamosa, for appellees, Melvin A. Duhme, Thelma A. Blatt, Arlene A. Tegmeier, and Helen A. Spratt.

Considered by MOORE, C. J., and MASON,* RAWLINGS, UHLENHOPP and REYNOLDSON, JJ.

* Serving after June 14, 1978 by special assignment.

RAWLINGS, Justice.

Raymond A. Duhme, sole specific devisee, appeals from probate order directing proportional abatement of each beneficiary's share for payment of federal estate taxes. We reverse.

February 22, 1975, Fred Duhme (Fred) died testate survived by nine children. His March 25, 1960 will and three codicils were admitted to probate. Trial court later determined the will was contractual and the codicils were invalid. On appeal, *Duhme v. Duhme*, 260 N.W.2d 415 (Iowa 1977), this court reversed, holding Fred gave requisite notice of intention to revoke.

Meanwhile, executor-son Kenneth sought modification of the general order of abatement "to allow the Executor to apportion the Federal Estate taxes against each beneficiary's share." Fred's three daughters and son Melvin joined this application, but son Raymond resisted. Trial court granted Kenneth's application and in so doing expressly reasoned his decision would be the same even if the codicils were later held valid. This appeal ensued. See Section 633.36, The Code 1975.

The parties here filed an Agreed Statement of the Record. Attached thereto were significant portions of the probate proceedings. Compare Iowa R.Civ.P. 340(j) with R.App.P. 15(f). Nevertheless, there is disagreement regarding the status of certain "loans" made by Fred and uncertainty about the proper figures to be used in computing estate assets, expenses and distributive shares. The following facts and figures are based respectively on a facial reading of Fred's testamentary provisions and amounts contained in the audited federal estate tax return, all of which had been presented to trial court. Because our computations differ markedly from those used by the parties and trial court in several critical instances, exactitude is appropriate.

I. Fred's gross estate was valued at $346,856.36 at date of death. Of that amount $81,952.67 is held in joint tenancy certificates of deposit which automatically vest in roughly equal amounts in Fred's six sons. Although these CD's do not pass under the will they constitute taxable estate assets, having been financed wholly by Fred. I.R.C. § 2040(a).

Under the thrice amended will, Raymond receives by specific devises two farms valued at $229,150, subject to his payment of $36,000 into the estate. Another bequest gives Raymond machinery and crops jointly owned by him and Fred, the half interest being valued at $5592.50. Under Article VII's general legacies Fred's three daughters receive $5000 apiece. The residue is to be divided equally among the six sons.

Before distribution of probate assets, however, certain estate debts and charges must be paid. These obligations, which include expenses of administration and Iowa inheritance tax, will amount to at least $29,921.44. See *In re Estate of Hoagland*, 203 N.W.2d 577, 579 (Iowa 1973). Finally, the estate owes $64,730.29 in federal estate taxes.

These expenses will reduce Fred's probate assets to $170,681.96. Even when supplemented by Raymond's $36,000 payment, Fred's remaining estate is insufficient to satisfy every bequest made. Therefore, abatement being unavoidable, our task is to determine the means of accomplishment.

In this regard two statutes come into play. Section 633.436, The Code 1975, states:

"Except as provided in section 633.211, shares of the distributees shall abate, for the payment of debts and charges, federal and state estate taxes, legacies, the shares of children born or adopted after the making of a will, or the share of the surviving spouse who elects to take against the will, without any preference or priority as between real and personal property, in the following order:

"1. Property not disposed of by the will;

"2. Property devised to the residuary devisee, except property devised to a surviving spouse who takes under the will;

"3. Property disposed of by the will, but not specifically devised and not devised to the residuary devisee, except

property devised to a surviving spouse who takes under the will;

"4. Property specifically devised, except property devised to a surviving spouse who takes under the will;

"5. Property devised to a surviving spouse who takes under the will.

"A general devise charged on any specific property or fund shall, for purposes of abatement, be deemed property specifically devised to the extent of the value of the property on which it is charged. Upon the failure or insufficiency of the property on which it is charged, it shall be deemed property not specifically devised to the extent of such failure or insufficiency."

And § 633.437 as amended, 1975 Session of the Sixty-Sixth General Assembly, ch. 208, § 12, provides:

"If, upon application to the court by a fiduciary or a distributee, and after notice to all interested parties, the court finds it clear and convincing that the provisions of the will, the testamentary plan, or the express or the implied purpose of the devise would be defeated by the order of abatement stated in section 633.436, the court shall determine the order of abatement the shares of distributees shall abate in such other manner as may be found necessary to give effect to the intention of the testator."

Before proceeding further, our use of this amended version of § 633.437 deserves some comment in light of its predecessor's routine application under a similar time sequence in *Colthurst v. Colthurst,* 265 N.W.2d 590 (Iowa 1978). Unlike *Colthurst,* we are now faced with the fact that these parties and trial court all applied the above quoted version.

■ Noticeably, the cited amendment did not become effective until August 15, 1975, almost six months after Fred's death. Normally, for will construction and other probate purposes only those laws existing at time of death are applicable, and rights then vesting or accruing may not be affected by later enactments. § 633.2(2); *Duhme,* 260 N.W.2d at 419–420; *Wester-*

*gard v. Klepper,* 229 N.W.2d 236, 240 (Iowa 1975); *In re Estate of Ryder,* 219 N.W.2d 552, 553–554 (Iowa 1974).

■ At the same time statutes of a procedural nature, not affecting vested or accrued rights, may be applied retrospectively. § 633.2(1); 79 Am.Jur.2d, Wills, §§ 197, 823; 95 C.J.S., Wills, § 309. Here, the only significant change was to effectively place upon a § 633.437 applicant a "clear and convincing" burden of proof. Compare ch. 145, § 3, 1977 Session of the Sixty-Seventh General Assembly. And this court has held a statutory shift in the burden of proof from one party to the other is procedural in nature and can operate retrospectively. *Schultz v. Gosselink,* 260 Iowa 115, 119–120, 148 N.W.2d 434, 437 (1967). See also 1 Jones on Evidence, § 5.1 at 523 (6th ed. 1972). A fortiori, a statutory elevation of the requisite burden can be applied to prior conduct. Trial court did not err in applying the more recent version of § 633.-437.

Returning to the statutes, if § 633.436's general order of abatement is followed, only Raymond will be a recipient under the will. The residual and Article VII general legacies must in turn abate completely for payment of federal estate taxes. Even then our calculations indicate Raymond will be required to pay at least $28,000 of remaining taxes in order to receive intact the bequeathed farms, equipment and grain.

On the other hand, under trial court's § 633.437 modified abatement order, Raymond's proportionate share of taxes owing would be significantly higher regardless of computation methods employed. Without approving trial court's formula, suffice to say Raymond would owe at least $39,000 in taxes. And the amount of his extra tax burden would be the sum proportionately distributable to the eight siblings.

But Raymond does not attack intrinsic fairness of trial court's proportional abatement plan. Rather, he contends trial court lacked authority to modify § 633.436's general order of abatement in *any* manner.

II. Thus there is once again presented an imponderable problem emanating from two statutes designed to provide a yardstick by which to fathom the unexpressed testamentary plans, designs and intentions of those no longer able to speak for themselves. Our review discloses this court has been called upon to cope with the interaction of §§ 633.436 and 633.437 on five prior occasions. *Colthurst,* 265 N.W.2d 596–598; *In re Estate of Noe,* 195 N.W.2d 361 (Iowa 1972); *In re Estate of Kraft,* 186 N.W.2d 628 (Iowa 1971); *In re Estate of Twedt,* 173 N.W.2d 545 (Iowa 1970); *Zion Lutheran Church v. Lamp Executors,* 260 Iowa 363, 149 N.W.2d 137 (1967). See also *In re Estate of Miguet,* 185 N.W.2d 508, 514–515 (Iowa 1971); *Bergren v. Estate of Mason,* 163 N.W.2d 374 (Iowa 1968).

Some of these cases have been criticized, however, as lacking in concise articulation of appropriate standards essential for guidance of bench and bar. See generally S. Kurtz & R. Reimer, Iowa Estates: Taxation and Administration, § 18.30 (1975); Comment, The Surviving Spouse Protection in the Abatement Scheme in Iowa, 57 Iowa L.Rev. 1394 (1972); Casenote, 21 Drake L.Rev. 375 (1972). See also *Noe,* 195 N.W.2d at 364–367 (Becker, J., dissenting); *Kraft,* 186 N.W.2d at 633–634 (LeGrand, J., dissenting). Hopefully, *Colthurst* and this opinion will supply the desired guidelines.

In any event this much is well settled: Ordinarily bequests abate in the order specifically delineated by § 633.436. Usually that enactment is dispositive. However, § 633.437 authorizes modification of the general scheme in that *unusual* case where § 633.436's application would defeat provisions of the will, the testamentary plan, or the express or implied purpose of the devise.

Any lingering uncertainty as to just how "unusual" a case must be for triggering of § 633.437 should be removed by the eighth circuit's accurate discussion of our involved statutes in *Folkerds v. United States,* 494 F.2d 749, 752–753 (1974), rev'g. 369 F.Supp. 1176 (N.D.Iowa 1973):

"[T]his situation must be an 'unusual case' and one where the will 'construed as a whole' must disclose 'in sufficiently clear and explicit terms' the contrary intent required. Unless, indeed, the requirement of strict and explicit terms to express a contrary intent is followed with scrupulous caution, the dispositions of the testator may well be nullified by a reviewing court according to the court's view of the deserving equities of the parties before it at the time of probate. The argument pressed is that, weighing the equities against the testamentary dispositions, the testator must have 'intended' the contended-for result in view of the manifest unfairness of holding otherwise. Such, however, is not the statutory command."

Similarly indicative of § 633.437's exceptional role is the currently invoked amendatory language. Modification of the general scheme is now appropriate only if the required result be shown *by clear and convincing evidence,* a relatively heavy burden. Cf. *Kufer v. Carson,* 230 N.W.2d 500, 503 (Iowa 1975). We intimated as much in *Noe,* 195 N.W.2d at 364, but it is now legislatively declared. Thus the issue in this case is not the relative fairness of proportional abatement but whether, on de novo review, trial court erred in holding Kenneth established, by clear and convincing evidence, "a testamentary plan to provide something for each of his children" which would be defeated by a § 633.436 abatement.

III. In light of the foregoing we return to the record.

As related in *Duhme,* Fred executed a will in 1960 per an express contract with his wife Mary to effectuate mutual wills. 260 N.W.2d at 416–417. Subject to Mary's life estate the following pertinent provisions were made. Land known as the Main Farm, worth almost $160,000 at Fred's death, was devised to Raymond subject to his payment of $36,000 into the estate. Remaining farmland known as the Small Place was to be sold to the highest bidding child (other than Albert). Article VII then

granted general legacies of $8000 to the daughters, $6000 to Melvin and Kenneth, and $3000 to Elmer. The residue was to be shared equally by the eight children (Albert being again excluded).

Fred executed his first contract-revoking codicil in 1964, several months before Mary died. Subject to the same $36,000 payment, it devised *both* farms to Raymond. Article VII's legacies to the daughters and Elmer were reduced to $5000 and $1000 respectively, while Kenneth's and Melvin's were increased to $10,000 and $12,000. The joint tenancy CD's were created at various times after execution of this codicil.

The second codicil, executed in 1965 after Mary's death, reduced Kenneth's bequest to $2000, apparently compensating for another provision which forgave the balance at death of a debt he owed his father. Fred also excluded his daughters from the residuary clause.

The third codicil eliminated Article VII legacies to Fred's sons but left those for the daughters intact. Also, Albert was added as a residuary beneficiary.

Kenneth suggests, without supporting evidence, that in 1960 Raymond's $36,000 payment approximated market value of the Main Farm; i. e., Raymond's "discount purchase" not only provided additional liquidity but placed Raymond's share in proportion with that of his siblings. But such argument ignores the first codicil's devise of additional acreage, without a corresponding increase in Raymond's financial obligation, despite the tremendous drain on liquid assets caused by this transfer and creation of the CD's. It also fails to explain why Raymond's obligation was never increased to counter inflated land values, even though Fred made substantial changes in his testamentary plan as late as 1972. Indeed, if anything permeates this will and three codicils it is Fred's intention to favor Raymond.

Nevertheless, Kenneth argues and trial court found that Fred intended each child to get something. This court has searched testamentary language in all four unambiguous documents and considered the entire scheme of distribution as well as circumstances existing at time of the various executions. However, this has revealed to us no evidence even approaching the clear and convincing level that Fred intended such a result.

■ True, every child would have received something under the will had there been little or no federal estate tax, and such a result would not have displeased their father. But the fact that some devises must go unsatisfied because the estate incurred more expenses than anticipated does not suffice to trigger § 633.437. As aptly stated in *Twedt*, 173 N.W.2d at 548: " 'In every case in which another devise is taken for taxes, the "express or implied purpose of the devise" is defeated, to some extent, under Section 633.437.' " If that were the test then § 633.437 would be the rule and § 633.436 the exception, a result the legislature clearly did not intend.

■ Moreover, the record reveals a gradual but distinct trend *away* from providing for the daughters, the only children who receive nothing from Fred if § 633.436 is followed. He not only reduced their Article VII legacies and removed them from the residuary clause, but failed to create any joint tenancy CD's for his daughters' benefit.

Again, if any conclusion regarding Fred's testamentary plan can be reached it is that he intended, above all else, Raymond be the major and, if necessary, sole beneficiary. Of course, our decision need not rest on this conclusion; Kenneth must prove a different plan and he has not done so.

IV. Admittedly, there are myriad complex problems which confront today's attorney in estate planning. And no practitioner can foreseeably protect against all possible contingencies. Even a specific testamentary provision for abatement other than that provided by § 633.436 can fall short due to wholly unexpected events. Therefore, § 633.437 was designed to prevent any such clearly unintended result.

But no unpredictability attends the economic complications which befell Fred's tes-

tamentary plan. As land values and Raymond's share increased, residual assets were deliberately drained 'away. Furthermore, Fred must be deemed to have known the law and therefore was presumably aware of the potential hazards to which his Article VII and residual legacies were subjected by economic realities and § 633.436. *Kraft,* 186 N.W.2d at 632. Application of § 633.-437 in this case would serve to impermissibly rewrite testator's will at Raymond's· expense. Trial court erred in so doing. On remand abatement shall be effected pursuant to § 633.436.

Costs on appeal are taxed to the Fred Duhme estate.

REVERSED AND REMANDED.